## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TINGLEY SYSTEMS, INC.,**

        **Plaintiff,**

**vs.**                                                 **Case No.: 8:05-CV-1936-T-27MAP**

**HEALTHLINK, INC.,**

        **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** are: (1) Defendant's Motion for Summary Judgment (Dkt. 72), to which Plaintiff has responded in opposition (Dkt. 90); (2) Plaintiff's Motion for Summary Judgment (Dkt. 74)[1], to which Defendant has responded in opposition (Dkt. 86); and (3) Defendant's Motion to Strike the Declaration of William Tingley (Dkt. 95), to which Plaintiff has responded in opposition (Dkt. 96).   Due to disputed issues of material fact, Defendant's motion for summary judgment is denied, Plaintiff's motion for summary judgment is granted in part, and Defendant's motion to strike is denied as moot.

### *Background*

In this action, Plaintiff Tingley Systems, Inc. ("Tingley") contends that Defendant HealthLink, Inc. ("HealthLink") is liable on claims for breach of contract and copyright infringement because HealthLink exceeded a user limit allegedly contained in the parties' software licensing agreement.  HealthLink maintains that there is no user limit, and in the alternative, that there is no evidence that it exceeded a user limit.

---

[1] Plaintiff's motion is properly styled as a "partial motion for summary judgment" because it has moved for summary judgment only as to certain of Defendant's affirmative defenses.

Tingley is a Florida corporation that creates, supports, and distributes computer software for the healthcare industry. (Dkt. 1, ¶ 1). The company currently has three full-time employees, William and Margie Tingley, who are husband and wife, and their son, Wayne Tingley. (Wm. Tingley Dep. at 48). HealthLink is a Missouri corporation that offers various healthcare-related services, including processing individual medical claims submitted by hospitals and physicians. (Siemen Dec. ¶ 3; Dkt. 1, ¶ 2).

*1. The 1985 License Agreement*

Pursuant to an agreement finalized in 1985, Tingley licensed its "Phamis" software to Christian Health Services Development Corp. ("1985 License Agreement"). (Dkt. 72, Exh. 2). That same year, Christian Health Services assigned the License Agreement to HealthLink. (Dkt. 72, Exh. 3). HealthLink paid Tingley $60,000 for the assignment. *Id.* The License Agreement allows HealthLink, as assignee, to use the software "on equipment approved by [Tingley] and identified in Schedule B" of the License Agreement. (Dkt. 72, Exh. 2). Schedule B provides that "[t]he System will be transferable to any computer purchased through Tingley Systems, Inc. for use by Christian Health Services Development Corp. in the conduct of its business." (Dkt. 72, Exh. 2). There is no user limit in the 1985 License Agreement. (Dkt. 72, Exh. 2; Wm. Tingley Dep. at 20).

*2.     Subsequent Purchase Agreements*

Over the next 16 years, the parties entered into several contracts entitled "Agreement for Purchase of Equipment" ("Purchase Agreements"). This dispute centers on the 1991 and 1994 Purchase Agreements between the parties.[2]

---

[2] The Purchase Agreements predating 1991 are not at issue. Tingley contends that HealthLink's periodic purchase of additional ports during these years was necessary, given the technology at that time, to allow a correspondingly equal number of additional users to access the Phamis software. (Compl. ¶¶ 22-25; Siemen Dep. at 79). HealthLink disputes that the number of ports is necessarily equivalent to the number of users. (Dkt. 72 at 11-12).

On or about May 17, 1991, the parties entered into a Purchase Agreement ("1991 Purchase Agreement") for an IBM 550 computer system ("IBM 550"). (Compl. Exh. G). The 1991 Purchase Agreement included the following entry for a "user license" on line 26:

ITM#   Model/Part #   Description of Equipment
26     240 USER       TSI APPLICATION USER LICENSE (240 USERS)

Tingley contends that this entry limits the number of users of the Phamis software to 240 users, which HealthLink disputes.

On or about March 3, 1994, HealthLink purchased an IBM 590 computer system ("IBM 590") from Tingley ("1994 Purchase Agreement"). (Dkt. 72, Exh. 7). The 1994 Purchase Agreement contained the following entries on lines 12 through 17:

ITM#   Model/Part #      Description of Equipment
12     AIX 1-32          AIX V3.2.X 32 USER LICENSE (550)
13     ITEM DVG33        AIX V3.2.X UNLIMITED USER LIC TRANSFER (590)
14                       TINGLEY SYSTEMS 2ND CPU LICENSE (590)
15     UNIDATA           UNIDATA NFA 1.1.6 LICENSE (550 & 590)
16     UNIDATA           UNIDATA 3.1.5A UNLIMITED USER LIC TRANS (590)
17     UNIDATA           UNIDATA 3.1.5A LICENSE (550)

HealthLink contends that the "TINGLEY SYSTEMS 2ND CPU LICENSE (590)" on line 14, for which there was a charge of $30,000, was an unlimited license to use the Phamis software on the IBM 590. Tingley, on the other hand, maintains that line 14 transferred the alleged 240 user license from the IBM 550 to the IBM 590. Tingley also claims that there is a "32 user license" for the IBM 550 in the 1994 Purchase Agreement, based on the item at line 12 for an "AIX V3.2.X 32 USER LICENSE (550)."

3.     *Alleged Breach*

Tingley brings this action contending that HealthLink: (1) allowed more than 240 users to access the Phamis software on the IBM S80; and (2) improperly transferred the Phamis software,

with an alleged 32 user license, from the IBM 550 to the IBM R50. As to the former contention, William Tingley testified that Gary Fleischer, a HealthLink employee, told him that HealthLink had 684 concurrent users on its system in a follow-up to Mr. Tingley's inquiry on the subject during a phone conversation. (Wm. Tingley Dep. at 152-53, 182-83).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to

4

deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## Discussion

### A. Governing Law

The parties apply Florida law to this case, apparently on the basis of the choice of law clause in the 1985 License Agreement. The parties have not, however, discussed application of Florida's Uniform Commercial Code ("U.C.C."), which governs contracts for the sale of goods. The 1985 License Agreement and subsequent purchase agreements fall under U.C.C.[3] The U.C.C. displaces the common law to the extent it is inconsistent therewith. *Burtman v. Tech. Chems., and Prods., Inc.*, 724 So. 2d 672, 676 (Fla. 4th DCA 1999). For instance, the U.C.C. allows the introduction of certain parol evidence concerning course of dealing, usage of trade, and consistent additional terms even when the contract language is unambiguous. *See* Fla. §§ 672.202, 671. 205; *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261-62 (11th Cir. 2003). Because the parties have not referenced evidence meeting the U.C.C.'s statutory requirements, however, the Court applies common law rules regarding the admission of parol evidence.

### B. Breach of Contract

"It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "GULF*

---

[3] The vast majority of courts addressing this issue have found that software licensing agreements fall under the U.C.C. *See e.g., First Nationwide Bank v. Fla. Software Servs., Inc.*, 770 F. Supp. 1537, 1543 (M.D. Fla. 1991) (noting that the pervasive view is that computer software programs are 'goods' under the U.C.C.); Stephen J. Sand, *Validity, Construction, and Application of Computer Software Licensing Agreements*, 38 A.L.R. 5th 1 § 9 (1996) (surveying cases explicitly or implicitly applying the U.C.C. to software license agreements); *Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 138 n.2 (2d Cir. 2005) (same); *CECG, Inc. v. Magic Software Enters., Inc.*, 51 Fed. App'x 359, 362 (3d Cir. 2002); *Franz Chem. Corp. v. Philadelphia Quartz Co.*, 594 F.2d 146, 149 (5th Cir. 1979) (applying the U.C.C. to a patent license agreement); *BMC Inds., Inc. v. Barth Inds., Inc.*, 160 F.3d 1322, 1329-30 (11th Cir. 1998) (applying the "predominant factor" test to determine whether mixed contract for goods and services fell under the U.C.C.).

*STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir. 1999). Only when the terms of a contract are ambiguous or susceptible to different interpretations is parol evidence admissible to "explain, clarify or elucidate" the ambiguous term. *Friedman v. Va. Metal Prods. Corp.,* 56 So. 2d 515, 517 (Fla. 1952); *McInerney v. Klovstad,* 935 So. 2d 529, 531-32 (Fla. 5th DCA 2006). Therefore, in analyzing a contract under Florida law, the Court must first look at the words used on the face of the contract to determine whether the contract is ambiguous. *Rose,* 186 F.3d at 1350. The initial determination of whether a contract term is ambiguous is a question of law. *Strama v. Union Fidelity Life Ins. Co.,* 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001); *Arriaga v. Fla. Pac. Farms, Inc.,* 305 F.3d 1228, 1246-47 (11th Cir. 2002). If the facts of the case are not in dispute, the ambiguity may be resolved as a matter of law. *Id.* On the other hand, "[w]here the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Strama,* 793 So. 2d at 1132 (quoting *Univ. Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.,* 513 So.2d 218, 219 (Fla. 1st DCA 1987).

a.   *Modification by the 1991 Purchase Agreement*

The 1985 License Agreement, standing alone, does not contain any limitation on the number of users of the Phamis software. (Dkt. 72, Exh. 2; Wm. Tingley Dep. at 20). However, the parties' 1991 Purchase Agreement modified the 1985 License Agreement and included a limitation on the users of the Phamis software. The 1991 Purchase Agreement provided that it was a "Schedule B *Addendum* to Software License Dated 3/18/85." (*See e.g.,* Compl. Exh. G) (emphasis added). The 1991 Purchase Agreement included the following item:

ITM#   Model/Part #   Description of Equipment
26      240 USER      TSI APPLICATION USER LICENSE (240 USERS)

HealthLink received a "Special 100% Trade-in Credit" for the $174,000.00 charge for this user

6

license.[4]

Although the parties have introduced evidence of the events leading to the inclusion of the terms "user" and "users"in the 1991 Purchase Agreement,  this parol evidence may only be considered if the terms are "reasonably susceptible to more than one construction." *Strama*, 793 So. 2d at 1132.  Based on the plain wording of the agreement, the "TSI Application User License" was limited to "240 Users."  Accordingly, parol evidence relating to the inclusion of these terms in the 1991 Purchase Agreement is not appropriately considered. Notwithstanding, the terms "user" and "users" are not defined in the agreement and the parties have argued varying constructions of the terms. (*See e.g.*, Dkt. 72 at 15, n.17).[5]

"The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs -- not on the parties having meant the same thing but on their having said the same thing." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985). Moreover, "[a] subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974); *see also* Fla. Stat. 627.204(3).  Accordingly, HealthLink's argument that the 240 user license is void

---

[4] To the extent the adequacy of consideration is an issue, an agreement modifying a contract does not require additional consideration under the U.C.C.  *See* Fla. Stat. § 672.209(a).

[5] Under the U.C.C., unambiguous terms may be explained or supplemented by evidence of usage of trade, course of dealing, as well as consistent additional terms if the writing is not intended as an exclusive statement of the parties' agreement.  Fla. Stat. § 672.202.  Thus, to the extent the parties properly introduce such evidence, it may be found that the term "users" is regularly understood to mean "concurrent users" or "sessions" in the software industry. *See* Fla. Stat. § 671.205(6) (requiring a party offering evidence of usage of trade to give notice to the other party).
HealthLink argues that Tingley's Complaint alleges only that HealthLink breached a "*concurrent user*" limit in the 1991 Purchase Agreement.  The Court does not read Tingley's claims so narrowly as to be limited to only a breach or infringement of a concurrent user license.  Such a restrictive interpretation would not comport with Rule 8's dictate that pleadings be construed to do substantial justice.  Fed. R. Civ. P. 8(f).
Although HealthLink now argues in a footnote that it was fraudulently induced to enter into this agreement (Dkt. 72 at 15 n. 17), HealthLink has not pled such a claim, and the Court therefore does not evaluate it.

for vagueness is without merit. The 1991 Purchase Agreement plainly constitutes a limited user license. However, neither party has fully developed their argument with respect to a construction of the terms "user" and "users." A definitive construction of these terms cannot therefore be made at this stage of the proceedings.

b.  *Modification by the 1994 Purchase Agreement*

The analysis does not end with the language of the 1991 Purchase Agreement. The 1994 Purchase Agreement also modified the 1985 License Agreement. (Compl. Exh. H).[6] This agreement includes the following items on lines 12 through 17:

| ITM# | Model/Part # | Description of Equipment |
|---|---|---|
| **12** | **AIX 1-32** | **AIX V3.2.X 32 USER LICENSE (550)** |
| 13 | ITEM DVG33 | AIX V3.2.X UNLIMITED USER LIC TRANSFER (590) |
| **14** | | **TINGLEY SYSTEMS 2ND CPU LICENSE (590)** |
| 15 | UNIDATA | UNIDATA NFA 1.1.6 LICENSE (550 & 590) |
| 16 | UNIDATA | UNIDATA 3.1.5A UNLIMITED USER LIC TRANS (590) |
| 17 | UNIDATA | UNIDATA 3.1.5A LICENSE (550) |

Tingley contends that: (1) line 14 transfers the 240 user license in the 1991 Purchase Agreement from the IBM 550 to the IBM 590; and (2) line 12 is a 32 user limit on Phamis software on the IBM 550. By contrast, HealthLink maintains that: (1) line 14 provides an unlimited license on the IBM 590; and (2) there is no user limitation on the Phamis software on the IBM 550.

A contract is interpreted as a whole. *Ospina-Baraya v. Heiligers*, 909 So. 2d 465, 472 (Fla. 4th DCA 2005); *Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004). Examining only the four corners of the agreement, this Court finds that the term "TINGLEY SYSTEMS 2ND

---

[6] The Court notes that the 1994 Purchase Agreement contained at Exhibit H to Plaintiff's Complaint also states that it is a "Schedule B Addendum to Software License Dated 3/18/85." A second copy of this agreement, submitted with Defendant's Motion for Summary Judgment, does not contain this wording. (Dkt. 72, Exh. 7). However, Defendant cites to Exhibit H to the Complaint in its Motion for Summary Judgment (Dkt. 72 at 18) and does not challenge the status of the 1994 Purchase Agreement as operating as an addendum to the 1985 License Agreement. (Dkt. 72 at 23 n. 25). Accordingly, the Court considers it as an addendum to the 1985 License Agreement.

CPU LICENSE (590)" is ambiguous. It is reasonable to infer that the "590" refers to the IBM hardware model, and not to a number of users. However, the agreement lists two licenses as "unlimited" and lists another license as a "32 user license." By contrast, "TINGLEY SYSTEMS 2ND CPU LICENSE" is not categorized as unlimited or limited. Although a license must necessarily be limited or unlimited, it is unclear which category this license falls into. The term is therefore ambiguous.

Because this term is ambiguous, other manifestations of the parties' intent are examined. William Tingley testified that he believed the IBM 590 received the 240 user license. (Wm. Tingley Dep. at 75). Margie Tingley also stated that this was a condition of the 1994 Purchase Agreement. (M. Tingley Dec. ¶ 11). On the other hand, a February 22, 1994 document labeled "Hardware Proposal for IBM 590," prepared by Tingley employee Vivian T. Satz for HealthLink, contains the handwritten notation *"unlimited users"* between "TINGLEY SYSTEMS'" and "SOFTWARE LICENSE FOR SECOND CPU." (Satz Dep., Exh. 48). Similarly, a March 1, 1994 document entitled "Hardware Proposal for IBM 590" contains an arrow with the handwritten notation *"unlimited users"* directed at the line for "TINGLEY SYSTEMS' SOFTWARE LICENSE FOR SECOND CPU." (Satz Dep., Exh. 48). As in the final 1994 Purchase Agreement, both lines are priced at $30,000. Ms. Satz stated that the handwritten notation on one of the proposals looked like the writing of her brother, Wayne Tingley. (Satz Dep. at 39). Mr. Siemen testified that the handwriting on one of the proposals looked like his own. (Siemen Dep. at 162). HealthLink also notes that the Phamis software did not contain coding to limit or restrict the number of persons using the software, although such coding can be, and often is, included in software. (Wm. Tingley Dep. at 26). Based on the foregoing, the Court finds that there is a material issue of disputed fact as to the intent of the parties regarding the existence of a user limit on the IBM 590.

9

c.    *Evidence of a breach*

Even assuming that there was a 240 user limit in effect in 1994 and 2005, HealthLink has argued in the alternative that there is no evidence that it actually violated this user limit because there is no evidence showing how many HealthLink employees used the Phamis software.[7]   The Court finds that there is a material and disputed issue of fact as to whether HealthLink exceeded a 240 user limit.   Specifically, William Tingley testified that Gary Fleischer told him that HealthLink had 684 users on its system.   (Wm. Tingley Dep. at 152-53, 182-83).   HealthLink has not pointed to any record evidence contradicting this statement.

The foregoing issues of fact pertaining to the existence of a user limit in 1994, as well as the breach of any such limit in 2005, preclude summary judgment on Plaintiff's breach of contract claim. The Court therefore does not reach the parties' arguments regarding the alleged 32 user license on the IBM 550.

### C.    *Copyright Infringement*

In order to sustain a claim for copyright infringement, Tingley must show by a preponderance of the evidence that: (1) Tingley owns a valid copyright in the Phamis software and (2) HealthLink copied "constituent elements of the copyrighted work that are original." *Calhoun v. Lillenas Pub.*, 298 F.3d 1228, 1232 (11th Cir. 2002).   Accordingly, a copyright owner may bring a claim for infringement against a licensee whose actions exceed the scope of the license. *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 306 (S.D.N.Y. 2001).   Because there are issues of material fact as to the scope of the license and whether HealthLink exceeded the scope of the license, as set forth above, HealthLink's motion as to this claim is denied.

---

[7] Pursuant to later purchase agreements, HealthLink paid $10,000 for a "TSI Application License Transfer" in 1997 and $10,000 for a "TSI Software License Transfer Fee" in 2001.   (Compl. Exhs. I, J).   The Court will assume, for the purposes of summary judgment, that these fees were charged to transfer whatever license existed under the 1994 Purchase Agreement.

### D.    Affirmative Defenses

Tingley moves for summary judgment on twelve of HealthLink's fourteen affirmative defenses.  Partial summary judgment may properly be granted on affirmative defenses.  *Int'l Ship Repair and Marine Servs., Inc. v. St. Paul Fire and Marine Ins. Co.*, 944 F. Supp. 886, 891 (M.D. Fla. 1996).  Tingley must, however, meet its burden of showing that Defendant cannot maintain these defenses by a preponderance of the evidence.

a.    *First Defense: Failure to State a Claim*

As its first affirmative defense, HealthLink contends that Tingley has failed to state a claim for breach of contract and copyright infringement.  (Dkt. 25, ¶ 48).  The Court previously denied HealthLink's motion to dismiss for failure to state a claim as to the copyright infringement claim (Dkt. 24). The Court finds that Tingley has stated a claim for breach of contract.  Summary judgment is therefore granted as to this defense.  *Home Design Servs., Inc. v. Park Square Enters., Inc.*, No. 6:02-cv-637, 2005 WL 1027370, *6-7 (M.D.Fla. 2005).

b.    *Second Defense: Compliance*

As its second affirmative defense, HealthLink contends that it "has complied with and performed all of its promises, obligations and duties to Plaintiff, if any, under any applicable contracts and complied fully with applicable law." (Dkt. 25, ¶ 49).  Tingley correctly notes that this amounts to a general denial of its claims.  Summary judgment is therefore granted as to HealthLink's second affirmative defense to the extent that it is pled as an affirmative defense.

c.    *Third Defense: Statute of Limitations, Estoppel, Laches, Acquiescence and Waiver*

As its third affirmative defense, HealthLink alleges that Tingley's claims are untimely under the relevant statute of limitations, or under the doctrines of estoppel, laches, acquiescence and waiver. (Dkt. 25, ¶ 50).  The statute of limitations for breach of contract actions is five years from when the

11

claim accrues, which is when "the last element constituting the cause of action accrues." Fla. Stat. §§ 95.11(2)(b); 95.031(1). The statute of limitations for copyright infringement actions is three years from when the claim accrues. 17 U.S.C. § 507(b). A copyright infringement claim accrues when a plaintiff "learns, or should as a reasonable person have learned that the defendant was violating his rights." *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 6:03-cv-1860, 2005 WL 3445522, *7 (M.D. Fla. Dec. 14, 2005).

Tingley asserts, without any elaboration, that its claims are timely under both statutes of limitation. On the other hand, HealthLink contends that Tingley's claims accrued in 1991, when it allegedly put Tingley on notice of its rejection of the user limit. Specifically, HealthLink cites to a document produced by its law firm, which Tingley objects to as unauthenticated (Dkt. 90 at 10 n.5). The letter is an unsigned draft, dated May 28, 1991, which was prepared by HealthLink's law firm for the signature of John O'Rourke, HealthLink's President at that time. (O'Rourke Dep. at 10). Neither party has located a copy of a final, signed letter, although Mr. O'Rourke testified that he remembered signing the letter.[8] (O'Rourke Dep. at 85). The letter states in relevant part:

> It is HealthLink's position that HealthLink is not obligated to pay any additional software license fee to TS under the Software License Agreement between Christian Health Services Development Corp. and Tingley Systems, Inc. dated December 12, 1984, which was assigned to HealthLink on June 27, 1985. The license fee which was required under the Software License Agreement ($60,000.00) has been fully paid.
> In our telephone conversations last week, you explained that the inclusion of the User License Fee on the Agreement For Purchase of Equipment was required under your Remarketing Agreement with IBM, and we permitted you to present it in this way as an accommodation to Tingley. In all of our discussions, however, we have stated that we did not believe HealthLink is required to pay any additional software license fee, and our position on that issue remains unchanged. (Dkt. 72, Exh. 17).

---

[8] For the purposes of summary judgment, the Court finds that the letter is authenticated by Mr. O'Rourke's deposition testimony that he signed it. *See* Fed. R. Evid. 901; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2722 (3d ed. 1998) (letter may be authenticated by deposition); *see also* Fed. R. Evid. 1004.

12

Because there is a dispute as to whether this letter was actually sent, there is an issue of material fact as to when the claims accrued.

Summary judgment is also not proper on HealthLink's defenses of estoppel, laches, acquiesence, and waiver.  Because it is disputed when Tingley learned of the alleged breach, it cannot be determined whether Tingley delayed unreasonably in asserting its objection, whether Tingley should be equitably estopped from bringing its claims, or whether Tingley waived its objection by subsequent conduct.

d.    *Fourth Defense: Failure to Mitigate*

HealthLink claims that Tingley failed to mitigate its damages after Tingley was allegedly put on notice by the 1991 letter that HealthLink had rejected the user limit. (Dkt. 25, ¶ 51).  Again, the Court finds that there is an issue of material fact as to whether this letter was sent, which precludes summary judgment.

e.    *Fifth Defense: Preemption by Copyright Act*

As its fifth affirmative defense, HealthLink contends that Tingley's breach of contract claim is preempted by the Copyright Act.  (Dkt. 25, ¶ 52). Based on the Court's previous ruling that the breach of contract claim is not preempted by the Copyright Act (Dkt. 24), summary judgment as to this defense is granted.

f.    *Seventh Defense: Copyright Misuse and Unclean Hands*

In its seventh affirmative defense, HealthLink alleges that Tingley's claims are barred because Tingley has engaged in copyright misuse and has unclean hands.  (Dkt. 25, ¶ 54). "The doctrine of copyright misuse prohibits a copyright holder from using a copyright 'to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant.'" *Park Square Enters., Inc.*, 2005 WL 1027370, *11 (quoting *Alcatel USA,*

*Inc. v. DGI Techs., Inc.,* 166 F.3d 772, 792 (5th Cir. 1999)).  To prevail on the defense of unclean hands, HealthLink must demonstrate: (1) that Tingley's alleged wrongdoing is directly related to the claim against which it is asserted; and (2) that HealthLink was personally injured by Tingley's conduct.  *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993).

Tingley has submitted no analysis of these defenses and therefore fails to meet its burden on summary judgment.  *Blalock v. Dale County Bd. of Educ.*, 84 F. Supp. 2d 1291, 1312-13 (M.D. Ala. 1999) (denying summary judgment where movant stated the applicable standard and cursorily stated that non-movant could not meet that standard).

g.    *Eighth Defense: Fair Use*

HealthLink has asserted the "fair use" doctrine as its eighth affirmative defense.  (Dkt. 25, ¶ 55).  Under certain circumstances, the doctrine of fair use allows the limited use of copyrighted materials in a reasonable matter without the consent of the copyright holder.  *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 552-53 (1985).  Fair use analysis "must always be tailored to the individual case."  *Id.*   In assessing whether the work is subject to fair use, a court weighs: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C.A. § 107.

HealthLink argues that although its use was commercial -- and not for any of the statutory purposes of "criticism, comment, news reporting, teaching, . . . scholarship, or research" -- it used only a small amount of the work.  Tingley does not address the second, third, or fourth fair use factors.  Accordingly, there is an issue of fact as to the amount and substantiality of the portion of

14

Tingley's software which HealthLink used or is using. Tingley's motion for summary judgment as to this defense is therefore denied. *Hibiscus Homes of Fla., Inc.*, 2005 WL 3445522, *10 (holding that summary judgment is inappropriate when there is a dispute as to the amount of material copied).

g.    *Ninth, Eleventh, Twelfth, Thirteenth and Fourteenth Defenses[9]:*

Tingley contends that summary judgment is proper as to HealthLink's ninth, eleventh, twelfth, thirteenth, and fourteenth "affirmative defenses." (Dkt. 25, ¶¶ 56, 58, 59, 60, 61). However, because these defenses address the validity of Tingley's copyright, Tingley's motion for summary judgment improperly shifts the burden to HealthLink to prove that Tingley has not satisfied the evidentiary requisites of its own claims. *See Hibiscus Homes of Fla., Inc.*, 2005 WL 3445522, *6; *Park Square Enterprises, Inc.*, 2005 WL 1027370, *7.   As HealthLink now notes, these defenses are essentially denials of the elements of Tingley's claims, rather than true "affirmative defenses." Summary judgment is therefore granted as to these defenses to the extent that they have been asserted as affirmative defenses.

### *Conclusion*

Upon consideration, it is **ORDERED AND ADJUDGED** that:

1)    Defendant's Motion for Summary Judgment (Dkt. 72) is **DENIED**;

2)    Plaintiff's Motion for Summary Judgment (Dkt. 74) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein;

---

[9]

Ninth Defense: Plaintiff's claims are barred or subject to dismissal for failure to comply with renewal, notice and registration requirements, and with other necessary requirements.
Eleventh Defense: Plaintiff's claims are barred because Plaintiff does not own the copyright for some or all of the works upon which Plaintiff's purported claims are based.
Twelfth Defense: Some or all of the copyrights on which Plaintiff relies have been forfeited or abandoned.
Thirteenth Defense: Some or all of Plaintiff's works or portions thereof are not original or are in the public domain.
Fourteenth Defense: Some or all of Plaintiff's works or potions thereof constitute unprotectable ideas, procedures, processes, systems, methods of operation, concepts, principles or discoveries.

3)      Defendant's Motion to Strike the Declaration of William Tingley (Dkt. 95) is

**DENIED AS MOOT**.[10]

**DONE AND ORDERED** in chambers this _____8ᵗʰ_____ day of May, 2007.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

---

[10] To the extent HealthLink improperly introduced evidence in its motion to strike that was not cited in the motion for summary judgment or in response to Tingley's motion for summary judgment, this material has not been considered herein.